HANNAH WALN, appellant,

*v.*

WILLIAM HANCE'S ADMINISTRATORS, respondents.

1. Where the owner of chattels permits the administrators of another's estate to make an inventory of such chattels, as the property of their decedent, and witnesses a bill of sale of such chattels to his wife, by such administrators, without objection, and makes no claim to the property for several years thereafter, he is estopped, as against the administrators, to assert title in himself as of the time of the inventory.

2. Where a transfer of chattels by a son-in-law to his father-in-law is, twenty years after the vendor's bankruptcy, and sixteen years after the vendee's death, for the first time attacked by the widow of the vendor, to whom the same were sold by the administrators of the vendee, in a suit by the administrators against her for the purchase price, evidence that the vendor remained in possession of the chattels, and testimony of the widow that it was the agreement between her husband and her father that the latter was to turn over the property to the former, are insufficient to show that the transfer was for the purpose of defrauding creditors.

3. The receipt from the defendant, for the chattels sold to her by the administrators, being in effect an assignment by defendant of her share in decedent's estate, as security for the price of the property, established such mutual relations of trust between her and the administrators as to take the transaction out of the operation of the statute of limitations.

On appeal from a decree advised by Vice-Chancellor Bird, in *Hance's Administrators* v. *Waln*, who delivered the following opinion :

This bill is filed for the purpose of making effectual the lien of an attachment upon the rights and interests of the defendant, Mrs. Waln, in certain moneys now in possession of the court, the proceeds of the sales of real estate of which Mrs. Waln's father died seized. The complainants, who are the administrators of the estate of William Hance, who was the father of Mrs. Waln, allege that they are entitled as such administrators to the sum of $2,627.50 out of the interest of Mrs. Waln in such proceeds by

Waln v. Hance.

virtue of an arrangement entered into between them and her on the 13th day of April, 1876. The administrators claim that certain personal property was the property of William Hance in his lifetime, and that prior to his death it became and was in the possession of William Waln, the husband of the defendant, Mrs. Waln, and that after the death of William Hance these administrators inventoried this property, but separately from the other property of William Hance, which inventory was not filed with the surrogate. They entered into an agreement with Mrs. Waln that she was to take possession of this property at its appraised value, and was to pay and satisfy the administrators therefor out of her share in the estate upon a final settlement thereof. This was expressed in writing and signed by her. In this paper she is spoken of with respect to such settlement as one of the heirs-at-law of William Hance, deceased. The paper is in the following words:

"Received April 13th, 1876, of the administrators of William Hance, deceased, two thousand six hundred and twenty-seven $\frac{50}{100}$ dollars on account of my distributive share of said estate as one of the heirs at law of said William Hance, deceased, and which I hereby direct, authorize and empower said administrators to take out of and deduct from my share on a final settlement of his said estate.

"$2627.50          (Signed)          Hannah L. Waln.
    "Witness present.
        "W. W. Waln,
        "C. S. Cannon."

They gave to her a paper writing with all of the articles so inventoried and their values annexed thereto, showing that she was entitled to the possession and ownership of such property, which is in the following words:

"Rec'd April 13th, 1876, of Mrs. Hannah L. Waln, wife of William W. Waln, the sum of two thousand six hundred and twenty-seven $\frac{50}{100}$ dollars in full of the appraised value of the goods and chattels, stock, &c., enumerated and specified in the foregoing list or inventory, which goods and stock are now on the farm occupied by the said William W. Waln, in Chesterfield Township, &, which belonged to the estate of William Hance, deceased, and which goods, stock, &c., are taken by and delivered to the said Hannah L. Hance by the administrators of said William Hance at their said appraised value & as her

property by and with the consent of said administrators, for which sum as above they hold the said Hannah L. Hances receipt as one of the heirs of said estate.

" 2627.50                                      LEWIS P. THOMPSON,
                              "For himself and in behalf of the ad-
                              "ministrators of Wm. Hance, dec."

At the time of the death of Mr. Hance his children entered into an arrangement with their mother, Mrs. Hance, by which the homestead farm was leased to her during her life. She died on the 28th day of March, 1891. Since then proceedings were instituted in partition for the division of said lands amongst the heirs-at-law, which resulted in a sale. The interest of Mrs. Waln in these moneys is the interest which the complainants claim by virtue of their attachment.

The resistance to the claim of the complainants may be said to be threefold—*first*, that the property never was the property of William Hance, that his administrators never had any right, title or interest therein ; *second*, if it was the property of William Hance, then it became his unlawfully and by virtue of a participation on his part with his son-in-law, William Waln, in an effort to defraud his creditors ; *third*, that the claim was barred by the statute of limitations at the time of the institution of proceedings in attachment.

*First.* Was William Hance the owner of this property at the time of his death ? The only persons who could have made resistance to this claim, as the case stands, were William Waln, the defendant, his wife, and the creditors of the said William Waln. William Waln and William Hance are both dead. Mrs. Waln, the defendant, by her answer makes claim to this property in her own right independently of the arrangement entered into between her and the administrators. But in her testimony she says that it belonged to her husband, and that she never claimed to have owned it. This testimony from her own lips must forever settle this branch of the case against her.

Now as to any claim of the defendant, Mrs. Waln, through her husband. The administrators of Mr. Hance took an appraisement of the personal property upon the homestead farm on

the 11th of April, 1876.  On the 13th day of the same month the administrators, with the appraisers, went to the farm occupied by the defendant and her husband, William Waln, and took an appraisement of all the personal property on said farm in the presence of William.  Mrs. Waln says she saw them there and supposed they were engaged in making an inventory.  There is no evidence that William Waln did anything else but consent to the making of this inventory.  When the arrangement was entered into between Mrs. Waln and the administrators he was one of the witnesses to the paper which Mrs. Waln signed.  He lived for several years thereafter without raising any objections whatsoever to the claim of the administrators which they made to this property by the act of making an inventory thereof.  Therefore, as between him and the administrators, it would seem quite impossible for him or anyone through him to make any successful claim to the property so inventoried.  It would be useless to cite authorities showing that he is estopped.

But does it appear that the conduct of William Hance was such as to deprive these administrators of the benefit which they claim?  Supposing the aid which it is said William Hance gave to William Waln in order to conceal his property from his creditors to be true, can the defendant, under the circumstances of this case, protect herself against these administrators?  It is not a contest between the administrators of William Hance and William Waln nor between such administrators upon the one hand and anyone who claims through William Waln on the other.  I found above, according to the testimony of Mrs. Waln herself, that this personal property was the property of William Waln, her husband.  I have also found, as a matter of law, resulting from the testimony in the cause, that by the conduct of William Waln in permitting the administrators to make the inventory and appraisement of this property and thereby to claim it that he was estopped forever thereafter from making any claim to such property.  This, therefore, places the title of the property in William Hance at the time of his death.  And it therefore follows that this controversy is directly between these

administrators, representing William Hance, on the one hand, and Mrs. Waln, the daughter of Mr. Hance, on the other. So far as she is concerned it is manifestly impossible for her in any legal sense to raise this question as against her father's administrators. This will be seen to be very clear when it is considered that she can have no title if her father's administrators had none. She cannot proclaim fraud upon her father's part to prevent his administrators showing title, but insist that as to herself the charge is not applicable.

*Second.* But would it be safe, under the circumstances of this case, to hold that the ancestor of these children was guilty of participating with his son-in-law in a fraud to conceal the property of the latter from his creditors? The testimony of one witness is to the effect that Mr. Hance spoke to him about purchasing two cows and a wagon, and that he purchased one cow and a wagon of William Waln, the debtor, only paying for the cow and afterwards returning the wagon. All of the other testimony, except that given by Mrs. Waln, is so meagre as to render it quite unsafe to be relied upon in a matter so important. Mrs. Waln only goes so far as to say that it was understood that her father was to turn the property over to her husband, but beyond this, as I have stated, the testimony does not extend.

These transactions took place in 1872, and William Hance died in March, 1876. In 1872 William Waln was declared a bankrupt, and, according to the answer, an assignee was appointed. As I have stated above, his creditors and William Waln were the only persons that could raise the question that has been presented as against Mr. Hance or his administrators. William Hance survived the bankruptcy four years. At the time of his death, William Waln was unquestionably in the actual possession and control of these goods and chattels. If they were William Waln's in fact, it is fair to presume—so long a period having elapsed since he went into bankruptcy—that they were his lawfully. If they were William Hance's, there is nothing to show that they were not his lawfully, and this is the conclusion to which I must come from the circumstances of this case, more than twenty years having elapsed since the bank-

ruptcy of William Waln, during which time his creditors have never asserted any claim to this property.

Hence, as to both the first and second points made by the defendant—that is, as to the title of the property being in William at the time of Mr. Hance's death, and as to the illegality of the transaction by which William Hance may have acquired the apparent title thereto in his attempt to conceal it from the creditors of William, his son-in-law—I must conclude in favor of the complainants.

*Third.* Is the claim of the complainants barred by the statute of limitations? This can be determined by ascertaining when the right of action first accrued. When the true spirit of the undertaking, as exhibited in the receipt given by Mrs. Waln to the administrators, is considered from the language used therein, it will be difficult to decide that such right of action had accrued at the time of the institution of the proceedings in attachment. The receipt acknowledges that she received so much money on account, as one of the heirs-at-law of William Hance, deceased, and authorized the administrators to take and retain that amount out of her share of his estate on final settlement. This, then, was so much on account, and that was to be considered on a final settlement. The claim is—the administrators having filed their account with the surrogate, and it having been approved by the orphans court in the year 1884—that the right of action accrued to the administrators immediately upon the allowance of said account by the court. The account shows that there was a balance in the hands of the administrators of over $1,900, over $1,200 of which was due to the administrators as commissions, leaving about $600 to be distributed amongst the next of kin. No steps whatever were taken to obtain a decree of distribution of this balance, nor were any steps taken between the parties themselves to effect a settlement. My conclusion is that the period of time contemplated by the parties when they spoke of a settlement was an actual final settlement when the balance due from one to the other should be definitely ascertained. This being my judgment, had Mrs. Waln presented her plea in the attachment proceedings, resisting the

plaintiff on the ground that his action was prematurely brought, she must have prevailed.

But this view is enforced by the highly inequitable character of the defence. These administrators, upon the 13th day of April, 1876, entered into this arrangement with Mrs. Waln, and in less than two months made application to the orphans court for the sale of lands to pay debts. In that application they charged themselves not only with the amount of the inventory of personal property found at the homestead of the deceased, but with the $2,627.50, the amount of the inventory found in the possession of William Waln, the husband of the defendant. This was a matter of public record. All of the real estate of which William Hance died seized, except the homestead, was sold to pay debts. It is impossible to doubt but that Mrs. Waln and her husband understood that the administrators had so charged themselves. William Waln survived at least ten years without questioning the validity of the transaction, and Mrs. Waln herself has never warned the administrators that their right to claim the difference between the $2,627.50 with which they had so charged themselves, and whatever balance might be due to her on a final settlement, would be resisted by her. Again, it would be most unjust to compel these administrators to suffer the loss of this large sum upon any mere technicality, if sound principles would sustain a contrary view. There being no reasonable ground for disputing the legality of the transaction between the administrators and Mrs. Waln, they became unquestionably liable for the amount of that inventory. Therefore, as between themselves and the next of kin, it is impossible for them to alter their account. They must stand charged with that item.

But why was this delay upon the part of the administrators in taking proceedings to compel an adjustment of these differences? It was because of an arrangement entered into between the heirs-at-law of William Hance and his wife, on the day that William was buried. This arrangement was an agreement between the next of kin (his eight children) and Mrs. Hance, in and by which they leased to her the homestead farm

during her lifetime.  In this the sons-in-law, who were two of the administrators, joined.  Mrs. Hance, the widow, survived until the 28th day of March, 1891.  I think it is extremely reasonable to believe that, at the time the arrangement was entered into between the administrators and Mrs. Waln, which was less than three weeks after the lease was made, they had in contemplation the fact that that lease was for the period of the lifetime of Mrs. Hance, and that a final settlement of the estate would not take place until after her death.  As I review the exhibits showing the extent and character of the indebtedness of Mr. Hance, and bear in mind the number of his children, it is quite clear to my mind that it was evident to all concerned that the interest of each one in the personal property, after the discharge of all liabilities, would be far less than $2,627.50.  This is put beyond all possible controversy when the fact is brought to light that two of his three farms were sold, one for $9,067.50 and one for $11,406.30.  Therefore, it requires no reasoning to satisfy the mind that all parties knew that whatever balance might remain for distribution upon the final settlement of the account of the administrators with the court, whether that was at the expiration of one year or ten, the balance in hands of the administrators, if any, would only be such surplus as would result from the sale of real estate, than which nothing could be more uncertain.

I have said that the parties must have contemplated their settlement after the death of Mrs. Hance, and that, even after that event, had Mrs. Waln filed her plea in abatement to the proceedings in attachment, she must have prevailed.  And with this view of the situation and relation of the parties, and the small interest that Mrs. Waln had in the balance in hand of the administrators, such balance being less than $100, how inequitable and unjust it would have been deemed had the administrators attempted, before the death of Mrs. Hance, to have enforced their claim against Mrs. Waln for the balance due to them from her.  Had such an attempt been made, there can be little doubt but they would have been defeated at law.  But if her remedy at law was found to be inadequate, doubtless she could have

obtained relief in this court upon the ground of fraud, for a court of equity undoubtedly would have said that, under the circumstances of this case, it is very manifest that the parties did not contemplate a settlement until the expiration of the lease given to Mrs. Hance, the widow, by her children and sons-in-law.

Any other view than that which I have expressed would be making use of the statute of limitations to accomplish fraud. This certainly would not be allowed by a court of equity in such cases to any greater extent than is allowed when persons attempt to achieve a fraud by means of the statute of frauds and perjuries. In the latter case it is never tolerated by a court of equity. *1 Beach Eq.* § *84; Ryan* v. *Dox, 34 N. Y. 307.*

The paper writing executed by Mrs. Waln and given to the executors was, in effect, an assignment by way of security of sufficient interest in her father's estate to satisfy the amount due to the administrators from her upon final settlement. This transaction established such mutual relations of trust and confidence as to bring into operation the doctrine laid down by Perry (*2 Perry Trusts* § *863*), where he says : "A *cestui que trust* cannot set up the statute against his *co-cestui que trust* nor against his trustee."

I think the complainants are entitled to relief, and will so advise, with costs.

*Mr. Joseph H. Gaskill,* for the appellant.

*Mr. William M. Lanning,* for the respondents.

MAGIE, J. (dissenting).

As I am unable to vote to affirm the decree in this cause, I deem it proper to briefly state my reasons.

By the two receipts exchanged between the parties, dated April 13th, 1876, and set out in the opinion of the vice-chancellor, appellant became the owner of certain personal property which she is estopped to deny belonged to the estate of her father, William Hance, deceased, and respondents, administrators

Waln *v.* Hance.

of said deceased, became entitled to its purchase price, $2,627.50, to be paid in the manner set out in appellant's receipt.

I think the learned vice-chancellor misconstrued the terms of that receipt in respect to such payment. When appellant thereby gave authority to respondents, as administrators, to take out and deduct the price of that property from her share, on a final settlement of the estate, the authority conferred was, in my judgment, plainly limited to her share of such moneys as, upon such settlement, would be in the hands of the administrators. Obviously, the receipt did not create any charge upon appellant's interest in the real estate of deceased which did not come to the hands of respondents as administrators.

If appellant's distributive share in the hands of the administrators after final settlement should prove insufficient to satisfy the claim of respondents, doubtless an implied contract on her part at once arose to pay respondents so much of the purchase price as remained unpaid.

Respondents' accounts, passed by the orphans court in 1884, show that appellant's distributive share was, in fact, insufficient, and if that account was final, she thereupon became liable for the balance.

But such liability furnishes no ground for a resort to equity. Respondents' remedy by an action at law was complete.

Respondents resorted to an action at law by issuing an attachment against the interest of appellant (who had become a non-resident) in the proceeds of the sale of real estate which had descended to her and others as the heirs-at-law of William Hance, and which had been sold by an officer of the court of chancery under a bill for its partition among the owners.

In aid of their proceedings at law, respondents had a right to ask the court of chancery to retain in its custody and control appellant's share of such proceeds until the determination of the action at law. But there is nothing in the case justifying a court of equity in passing upon the liability of appellant and directing, as this decree does, the payment of her moneys to respondents upon a claim pending in the action at law yet undetermined.

For these reasons I vote to reverse the decree and modify it in accordance with the view above indicated.

*For affirmance*—THE CHIEF-JUSTICE, DEPUE, GUMMERE, LIPPINCOTT, LUDLOW, VAN SYCKEL, BOGERT, BROWN, SMITH, TALMAN—10.

*For reversal*—MAGIE—1.